

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00312-CV

HOPPENSTEIN PROPERTIES, INC.             APPELLANT

V.

BILL SCHOBER AND ANOTHER             APPELLEES
MAN'S TREASURE, L.L.C.

------------

## FROM COUNTY COURT AT LAW NO. 3 OF TARRANT COUNTY

------------

## OPINION

------------

This is an appeal from a jury trial on what damages, if any, a landlord of commercial lease property was entitled to when the tenant prematurely vacated the leased premises. In three issues, appellant Hoppenstein Properties, Inc. challenges the jury's finding that it failed to mitigate its damages upon the breach by appellees Bill Schober and Another Man's Treasure, L.L.C. (issues one and two) and the trial court's failure to include in the jury charge that the breaching

tenant bears the burden to prove the landlord's failure to mitigate (issue three). We reverse and remand.

## Factual and Procedural Background

Appellees as tenant signed a Shopping Center Lease with appellant as landlord. The lease term began May 1, 2006 and was to continue for six years and three months. Appellees agreed to use the leased premises for "Furniture/Antique Sales."

When appellees first moved into the leased premises, the condition was "not particularly bad." Appellees did general cleanup, painted, and carpeted one of the rooms. There were some squirrels inside, which condition continued to occur periodically while appellees occupied the premises. Appellees spent about $40,000 making the space ready.

However, the business did not do well after moving to the leased premises.[1] Schober wrote appellant on December 31, 2006, asking for some of the rent to be deferred, which appellant agreed to. But eventually, on April 1, 2007, appellees vacated the leased premises and informed appellant by letter. According to Schober, as of that date, the leased premises were "cleaned up" and in the same condition as when appellees moved in.

On July 17, 2007, appellant sued appellees for damages for prematurely vacating the premises. Appellees stipulated that they had defaulted on the lease

---

[1]Appellant's business had done well in a prior location in another city, but he had to move because that landlord took over his space.

2

but contended that appellant had failed to mitigate its damages. After a trial, a jury awarded appellant $5,500 in damages although appellant had asked for $107,584.54. Appellant appeals from the jury's verdict.

**Legal and Factual Sufficiency of Jury's Damages Award**

In its first two issues, appellant challenges the legal and factual sufficiency of the jury's $5,500 damages award. According to appellant, there is no evidence to support the jury's implied finding that appellant wholly failed to mitigate its damages caused by appellees' breach of the lease, or, in the alternative, the evidence supporting that finding is too weak or against the great weight and preponderance of the evidence.

**Standard of Review**

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a

3

reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). When, as here, the party *without* the burden of proof on a fact issue complains of an adverse fact finding, that party must show that there is "insufficient evidence" supporting the finding, that is, that the evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the evidence contrary to the finding. *See Garza*, 395 S.W.2d at 823; W. Wendall Hall, *Standards of Review in Texas*, 38 St. Mary's L.J. 47, 263, 265 (2006).

**Applicable Law**

A landlord has a duty to make reasonable efforts to mitigate damages when the tenant breaches the lease and abandons the property. Tex. Prop. Code Ann. § 91.006(a) (Vernon 2007); *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex. 1997); *Landry's Seafood*

4

*House-Addison, Inc. v. Snadon*, 233 S.W.3d 430, 436 (Tex. App.—Dallas 2007, pet. denied). The landlord's failure to use reasonable efforts to mitigate damages bars the landlord's recovery against the breaching tenant only to the extent that damages reasonably could have been avoided. *Austin Hill Country Realty*, 948 S.W.2d at 299. However, the landlord is not required to simply fill the premises with any willing tenant; the replacement tenant must be suitable under the circumstances. *Id*.

A tenant's assertion that a landlord failed to mitigate damages is an affirmative defense. *Austin Hill Country Realty*, 948 S.W.2d at 300; *McGraw v. Brown Realty Co*., 195 S.W.3d 271, 277 (Tex. App.—Dallas 2006, no pet.). Thus, the tenant properly bears the burden of proof to demonstrate that the landlord has failed to mitigate damages and the amount by which the landlord could have reduced its damages. *Austin Hill Country Realty*, 948 S.W.2d at 300. A defendant is not entitled to any reduction in the amount of damages if it does not prove the amount of damages that could have been avoided. *Cole Chem. & Distrib., Inc. v. Gowing*, 228 S.W.3d 684, 688 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Broken Spoke Club, Inc. v. Butler*, No. 02-02-00116-CV, 2004 WL 1858119, at *2–3 (Tex. App.—Fort Worth Aug. 19, 2004, no pet.) (mem. op.). The policy underlying mitigation is to avoid waste rather than penalize the mitigating party for not doing enough. *See Austin Hill Country Realty*, 948 S.W.2d at 298–99; *MOB 90 of Tex., L.P. v. Nejemie Alter, M.D., P.A.*, No. 13-08-

5

00173-CV, 2009 WL 1026603, at *3 (Tex. App.—Corpus Christi Apr. 16, 2009, no pet.) (mem. op.).

**Applicable Facts**

Norman Hoppenstein, who is appellant's vice president and a shareholder, testified that appellees' initial minimum guaranteed rent was $840 per month, plus triple net charges,[2] for the first month and for months five through twenty-four. According to Hoppenstein, the rent was "very reasonable" for such a large space. Adding the triple net charges, the total rent payment was $2,500 per month. For months twenty-five through forty-eight, the total monthly rent increased to $3,000 per month ($1,340 minimum guaranteed rent plus triple net expenses). The lease also provided for a ten percent late fee if appellees did not timely pay rent by the first day of each month.

Hoppenstein testified that appellant received the last full rent payment from appellees on December 8, 2006 and that it received two $1,000 payments thereafter. Although appellees did not pay the full rent for January and February, appellant did not start charging them a ten percent late fee each month until March 2007. Appellant calculated as part of its damages fourteen late fees of $84 and twelve late fees of $134, based on a percentage of the increased rent beginning in month twenty-four.

_____

[2]A triple net lease is one in which the tenant's rent includes a percentage of the landlord's real property taxes, insurance, and common area maintenance charges for the property in addition to the basic rent.

6

After appellant received notice from appellees that they had vacated the space, appellant "contracted to have a for-lease sign up. And . . . start[ed] answering inquiries about the space from people who might be interested in leasing the space." Hoppenstein also said that appellant "continued to show the space . . . [and] spoke[] to a number of people." He testified that appellant eventually leased part of the space to a hookah bar but had to spend $56,041.88 to renovate that part of the space for the new tenant.[3] Hoppenstein could not recall whether he got any additional bids for the improvements that were done for the hookah bar.

At the time of trial, the hookah bar was paying rent at a higher rate than the rate appellees were obligated to pay in their lease. Appellant credited the rental paid by the hookah bar to appellees' outstanding rent. The total credit appellant applied to appellees' lease was $14,783, after applying (1) credits for reconciliation of the triple net charges and for the $2,500 security deposit and (2) a debit for the cost of the renovations to the premises for the hookah bar. Appellant asked for total damages of $107,584.54.

Schober testified that around the time he started to vacate the premises, he heard that another business owner in the center, Ken Cook, might be interested in leasing the leased premises. According to Schober, when he talked

_____

[3]Hoppenstein also testified that the day before trial, a banquet hall signed a lease for the remainder of the premises but that the lease would not be effective until the prospective tenant obtained all necessary municipal approvals.

7

to Cook, Cook said, "[T]hat's going to be just what I need," and later came to see the leased premises.

Cook testified that he owns an "ad specialty business," printing T-shirts and making embroidery, signs, banners, and advertising-type items. At the time of trial, he had been in business for fifteen years.

According to Cook, when he moved his business into the shopping center, next to a bingo hall, appellant's leasing agent called and said that people at the bingo hall were complaining about the odor released when he printed a certain type of sign that he prints frequently. He tried to reduce the odor, but the complaints continued until appellant's leasing agent called and told Cook he could no longer print those types of signs on the premises. The leasing agent was the only person he had ever dealt with on behalf of appellant.

Cook moved the sign printing operation to his home garage, but that was a failure. Around that same time, he realized that appellees had moved out and tried to contact them to see if he could move into their space because it was in a different building and isolated from other tenants. Cook testified that when he talked to Hoppenstein about leasing appellees' property, Hoppenstein said "that if I moved in there, he wouldn't be able to go after Mr. Schober and that he didn't think that space would do me any good any more - - do me any better than the space I was in." Even after Cook explained to Hoppenstein the situation regarding the signs and how appellees' space was better situated for his business, Hoppenstein said that he did not think it would help and recommended

8

another landlord down the street. Cook testified that he would not have needed any improvements to appellees' leased premises and did not request any. He eventually had to abandon his lease with appellant; appellant sued him for the breach and obtained a judgment for $21,000.

Hoppenstein testified that he did not rent appellees' leased premises to Cook for "a number of reasons." He remembered that Cook had approached him about swapping his leased premises for appellees' and that Cook had said he wanted a small retail location for walk-in business. Hoppenstein told Cook that he would be better off with a location closer to the street, rather than one so far back from the street; the shopping center is in a U-shape, and appellees' leased premises was in the center of the U bend, farther away from the street than the other leased premises, although facing the street.

Hoppenstein also explained that by moving Cook to appellees' vacated premises, he would not be mitigating any damages because he would be moving a tenant from one leased premises to another in the same center; thus, he would lose money on one or the other. He would also not be able to mitigate the fumes problem that was already occurring. Finally, Hoppenstein knew that Cook was having financial problems, which was of concern because he would be moving his business into an even bigger space. Hoppenstein showed the jury rent checks from Cook that had been returned with the notation that the bank account on which the check was drawn had been closed.

9

Hoppenstein testified that appellant advertised vacancies by putting up for lease signs in the vacant premises and putting one on the street near the shopping center; he also testified that some companies list vacant space for other brokers and that those companies call landlords periodically. But Hoppenstein did not say whether he responded to any of those phone calls or if he even got any. He also testified that the center was quite large and very difficult to lease because it was built in the 1960s and not suited for retail.

**Analysis**

The jury awarded appellant only $5,500, which is the amount of the past due rental that had accrued before appellees vacated the premises. The jury did not award any amounts—rental, late fees, cost of improvements to the premises (all authorized by the lease agreement in the event of a tenant default)—for any time after appellees vacated the premises.

Appellees had the burden of proving the amount of damages appellant could have avoided. *Austin Hill Country Realty*, 948 S.W.2d at 299; *McGraw*, 195 S.W.3d at 277. But appellees failed to prove that appellant could have immediately rented appellees' premises and therefore avoided *all* damages. *See Cole Chem.*, 228 S.W.3d at 688. Neither Cook nor Schober testified as to when Cook could have moved into and begun paying rent on appellees' leased premises. Schober said he heard Cook was interested in renting the premises "around the time" appellees vacated. Cook testified that when he called to check on the availability of the premises, a woman told him appellees had already

10

moved out; Cook tried to call appellant's leasing agent, who did not return his calls. Cook then called appellant, and someone told him the leasing agent had been fired; he left a message for Hoppenstein, who took about a week to return the call. Although Cook testified that he was able to immediately move into appellees' premises, the evidence shows that there would have been at least some gap between appellees' vacating the premises and Cook's moving in regardless of appellant's efforts or lack thereof.

Likewise, neither Schober nor Cook offered evidence as to how long it would have taken appellant to find a replacement tenant for Cook's premises, which would have remained vacant if Cook had moved into and started paying rent on appellees' premises. The minimum rental on Cook's premises was $2,187 per month, which appellant would not have been able to collect if Cook had moved into appellees' premises and started paying appellees' minimum rental.[4] Moreover, appellant produced evidence that two of Cook's March rent checks had been returned because the account on which they were written was closed.[5] *See MOB 90 of Tex., L.P.*, 2009 WL 1026603, at *3 (noting that court

---

[4]Hoppenstein testified that a man named Mike Pope had moved into and was paying rental on Cook's premises, but appellees did not produce evidence as to when Pope moved into those premises. When asked on cross-examination whether it was November 1, 2007, Hoppenstein replied that he did not know; appellees did not produce a lease or other proof of when Pope moved into those premises.

[5]Cook also testified that his business had been doing poorly since it had been burglarized and because of the poor economy.

11

had found no Texas law requiring landlord to work with breaching tenant to mitigate damages).

Appellees did bring forward evidence that Hoppenstein was not interested in mitigating appellant's damages; however, they failed to prove that appellant was not entitled to any post-abandonment damages whatsoever. *See Cole Chem.*, 288 S.W.3d at 688. In addition, although appellees presented evidence that the $56,041.88 appellant spent on renovating the abandoned premises was unreasonable—in that the amount of renovations exceeded the total minimum rental payable for the two-year initial term of the hookah bar's lease—appellees failed to prove that no renovation would have been necessary.[6]

In effect, appellees presented evidence that appellant unreasonably failed to mitigate at least some of the damages it pled and proved at trial but failed to prove that it could have avoided all damages from the time appellees vacated the premises.[7] Accordingly, we conclude and hold that the evidence is factually insufficient to support the jury's finding that appellant sustained only $5,500 in damages from appellees' breach. *See Cadle Co. v. Regency Homes, Inc.*, 21 S.W.3d 670, 681–82 (Tex. App.—Austin 2000, pet. denied) (op. on reh'g). We overrule appellant's first issue but sustain appellant's second issue.

---

[6]Cook testified that he would have been willing to rent the premises as-is, but as we have explained, appellant was not required to work with him as a tenant because his rental checks for his own space were being returned for a closed account. *See MOB 90 of Tex.*, *L.P.*, 2009 WL 1026603, at *3.

[7]Appellees did not plead or prove the affirmative defense of waiver.

12

**Instruction on Mitigation Did Not Improperly Shift Burden of Proof**

In its third issue, appellant contends that the trial court reversibly erred by failing to charge the jury that appellees had the burden to prove whether appellant failed to mitigate its damages as result of the breach, thus shifting the burden of proof on the mitigation issue.[8]

At the charge conference, the trial court agreed to include the following question in the charge, "What sum of money, if any, if paid now in cash would fairly and reasonably compensate [appellant] for its damages, if any, that resulted from the breach of the lease?"  The court also proposed the following, "Do not include in your answer any amount that you find [appellant] could have avoided by the exercise of reasonable care."  Appellant's counsel objected to that part of the charge because "[t]he standard should be whether [appellant] reasonably mitigated [its] damages, not whether [it] exercised reasonable care."  The trial court declined to change the question and appellant stated one more objection: "On this question about the exercise of reasonable care, it should have a burden of proof, that the defendants [appellees] have the burden of proof in proving that he [appellant] didn't exercise reasonable care.  At least a general instruction."  After argument, the trial court overruled that objection as well.  The trial court submitted the following to the jury:

_____

[8]Even though we will remand because of our disposition of appellant's second issue, we nevertheless address appellant's third issue because it could be raised again at a second trial.

13

## QUESTION NO. 1

What sum of money, if any, if paid now i[n] cash, would fairly and reasonably compensate [appellant] for its damages, if any, that resulted from breach of the lease?

Do not include in your answer any amount that you find [appellant] could have avoided by the exercise of reasonable care.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Appellees contend that appellant failed to preserve its complaint about this issue. Appellant submitted its own question on damages and objected to appellees' proposed instruction on their affirmative defense of mitigation. Appellees contend that to preserve its objection, appellant needed to additionally request a replacement instruction in writing. But appellant's objection was all that was needed to preserve the issue as to the instruction because the trial court submitted it. *See Religious of Sacred Heart of Tex. v. City of Houston*, 836 S.W.2d 606, 614 (Tex. 1992) ("Objection, however, is the proper method of preserving complaint as to . . . an issue actually submitted, but claimed to be defective." (quoting *Lyles v. T.E.I.A.*, 405 S.W.2d 725 (Tex. Civ. App.—Waco 1966, writ ref'd n.r.e.)). Thus, we hold that appellant preserved this issue for our review.

Rule 277 provides that "[t]he placing of the burden of proof may be accomplished by instructions rather than by inclusion in the question." Tex. R. Civ. P. 277. "Thus, the Rules of Civil Procedure contemplate that the jury can be

14

instructed about applying the burden of proof in two ways:  [by] an admonitory instruction *or* by placement of the burden through the question." *In re Commitment of Beasley*, No. 09-08-00371-CV, 2009 WL 3763771, at \*7 (Tex. App.—Beaumont Aug. 6, 2009, pet. denied).  Here, the instructions before the questions include the following:

> Answer "Yes" or "No" to all questions unless otherwise instructed.  A "Yes" answer must be based upon a preponderance of the evidence unless otherwise instructed.  If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." Whenever a question requires an answer other th[a]n "Yes" or "No," your answer must be based on a preponderance of the evidence unless otherwise instructed.

Thus, here, the trial court defined the proper burden of proof for the question in the instructions in the charge; rule 277 requires no more.  *See* Tex. R. Civ. P. 277; *Austin Hill Country Realty*, 948 S.W.2d at 299.  Accordingly, we conclude and hold that the trial court did not reversibly err by refusing to include appellant's requested addition to the question.

We overrule appellant's third issue.

15

## Conclusion

Having overruled appellant's first and third issues, but also having sustained appellant's second issue, we reverse the trial court's judgment and remand for a new trial.  *See Cadle Co.*, 21 S.W.3d at 681–82.

                                        TERRIE LIVINGSTON
                                        CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

DELIVERED:  November 18, 2010